J-S67030-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF: T.J.S. | ⋮ | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: T.B., MOTHER | ⋮ | No. 1064 WDA 2014 |

Appeal from the Order May 20, 2014,
in the Court of Common Pleas of Westmoreland County, Orphans'
Court, at No(s): 23 of 2013

| | | |
|---|---|---|
| IN RE: ADOPTION OF: T.B.S. | ⋮ | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: T.B., MOTHER | ⋮ | No. 1065 WDA 2014 |

Appeal from the Order May 20, 2014,
in the Court of Common Pleas of Westmoreland County, Orphans'
Court, at No(s): 24 of 2013

BEFORE:   DONOHUE, MUNDY, and FITZGERALD*, JJ.

MEMORANDUM BY MUNDY, J.:                    **FILED FEBRUARY 2, 2015**

Appellant, T.B. (Mother), appeals from the May 20, 2014 orders involuntarily terminating her parental rights to her sons, T.J.S., born in August 2007, and T.B.S., born in November 2011.[1]  After careful review, we affirm.

This action arises from the filing of two petitions for the involuntary termination of Mother's parental rights pursuant to 23 Pa.C.S.A. §§ 2511(a)(2), (5), (8), and (b) by the Westmoreland County Children's

---

* Former Justice specially assigned to Superior Court.

[1] By orders dated July 10, 2013, the parental rights of T.J.S. and T.B.S.'s natural father, H.C.S., Jr. (Father), were voluntarily terminated.  Father did not file a notice of appeal, and he is not a party to this appeal.

Bureau (WCCB) on February 15, 2013. Subsequently, Mother expressed the desire to relinquish her parental rights to T.J.S. and T.B.S., and, following a hearing, on July 10, 2013, the orphans' court voluntarily terminated Mother's parental rights. Thereafter, on August 7, 2013, Mother filed timely notices of appeal. This Court concluded that Mother's waiver of her right to counsel was invalid, and, therefore, her consent to voluntarily terminate her parental rights was void. As such, on February 7, 2014, we reversed the orders and remanded the case to the orphans' court. *See In re Adoption of T.J.S. & T.B.S.*, 97 A.3d 797 (Pa. Super. 2014) (unpublished memorandum).

Upon remand, on May 15, 2014, the orphans' court held an evidentiary hearing for the involuntary termination of Mother's parental rights. WCCB presented the testimony of the following witnesses: Lisa Wood, social worker at Wesley Spectrum Services; Carol Hughes, M.A., a licensed psychologist who performed a forensic bonding assessment; and Susan Storer, the WCCB caseworker. Mother testified on her own behalf, and she presented the testimony of her husband, R.B., and the Court-Appointed Special Advocate, Rhonda Dean. At the conclusion of said hearing, the orphans' court set forth findings of fact pertaining to each child, that the competent record evidence supports. Regarding T.J.S., the orphans' court made the following findings of fact pursuant to Section 2511(a)(2).

> 1) Mother's repeated incapacity has caused [T.J.S.] to be without essential parental care, control

or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity cannot or will not be remedied by [Mother].

2)    Specifically, th[e orphans' c]ourt finds that WCCB has provided services since 2010 in an effort to remedy Mother's incapacity.

3)  Prior to the WCCB assuming custody, the WCCB began providing General Protective Services to Mother and the family on May 26, 2010 due to Mother's mental health issues, parenting deficits, and domestic violence reports.

4)    Mother has received the following contracted services since September of 2010: intensive family reunification services, including hands-on parenting and budgeting, supervised visitation with [T.J.S.], anger management treatment, mental health treatment and medication.

5)    Ongoing reported concerns regarding [T.J.S.]'s safety within Mother's home include, pill bottles, medication, lighters, poisonous cleaners, and sharp objects on the floor and/or within [T.J.S.]'s reach. On another occasion, Mother dressed [T.J.S.]'s infant brother [T.B.S.] in clothing not appropriate for the weather conditions.  Mother failed to realize that [T.B.S.] was overheating due to being dressed for very cold temperatures during the unseasonably warm December day and, on another occasion, Mother allowed [T.J.S.] to walk around in snow while only wearing footed pajamas.  Mother also failed to change [T.B.S.]'s diaper for approximately twelve (12) hours, not realizing that he had clearly soiled the diaper on multiple occasions.

6)    [T.J.S.] was taken into agency custody on March 15, 2011 and was returned to Mother's custody on May 15, 2011, with continued services.

7) On December 5, 2011, [T.J.S.] and [T.B.S.] were taken into custody when Mother violated the established safety plan.

8) While [T.J.S.] has been in custody, Mother has continued to receive intensive parenting instruction in an effort to alleviate the circumstances which necessitated placement.

9) Although Mother has complied moderately with the Child Permanency Plan, th[e orphans' c]ourt finds that Mother has made no progress towards alleviating the circumstances which necessitated placement, in that, while Mother has received intensive parenting services for over two (2) years, Mother has been unable to demonstrate that she is capable of implementing the parenting that has been modeled for her and which is necessary to ensure the safety and welfare of [T.J.S.]

10) During supervised visitation, Mother had demonstrated concrete thinking and has been unable to develop flexible thinking. Mother has consistently demonstrated unsafe parenting with [T.J.S.], and although Mother has been instructed extensively in proper and safe parenting, Mother has been unable or unwilling to implement the techniques modeled for her. Mother does not react appropriately to matters that would normally be concerning, such as a child falling. Mother has a difficult time making conversation with [T.J.S.] and requires prompting during the visits to do so. Mother has difficulty with multi-tasking and does not react well when something occurs during the visit that is not planned. Mother is still not able to care for and engage both of her children at the same time. Mother has a lack of understanding of appropriate developmental expectations and in such regard, Mother inappropriately disciplines [T.J.S.] for age-appropriate behaviors.

11) Psychologist, Carol A. Hughes, completed a Forensic Bonding Assessment in June of 2013 and updated that Assessment in April/May of 2014. At

the termination hearing, the parties stipulated to Ms. Hughes being qualified as an expert in the area of bonding and attachment. Th[e orphans' c]ourt accepts and relies upon Ms. Hughes' analysis of the bond between Mother and [T.J.S.]

12) Based upon Ms. Hughes' observation of [T.J.S.] and Mother's interaction during supervised visitation, th[e orphans' c]ourt finds as follows: [T.J.S.] does not perceive Mother as being available to reliably and consistently meet his needs. Therefore, he does not turn to her to do so. Specifically, during visits, [T.J.S.] did not approach Mother to greet her with a physical display of affection. When Mother approached [T.J.S.] and picked him up, [T.J.S.] "went limp" and did not reciprocate Mother's embrace. [T.J.S.] mostly engaged in solitary play during Mother's visitation and placed himself out of social distance from Mother. [T.J.S.] demonstrates an "insecure avoidant relational pattern" with Mother. Mother continues to present with significant parenting deficits.

Findings of Fact, 5/20/14, at 1-3 (1064 WDA 2014).[2] The findings of fact regarding T.B.S. are substantially similar to the above quoted findings in the matter of T.J.S. **See** Findings of Fact, 5/20/14, at ¶¶ 1-11 (1065 WDA 2014). Pertinent to this appeal we note the orphans' court's 12th finding of fact differs regarding T.B.S., as follows.

12) Based upon Ms. Hughes' observation of [T.B.S.] and Mother's interaction during supervised visitation, th[e orphans' c]ourt finds that, because [T.B.S.] was one (1) month of age when he came into the custody of the WCCB, Mother has no long-term history of providing caregiver responsibilities for [T.B.S.] As such, there is no development of an

---

[2] We note the orphans' court's findings of fact do not contain pagination. Therefore, for ease of review, we have assigned each page a corresponding page number.

attachment bond for [T.B.S.] and Mother. Mother lacks the skill and ability to form that attachment and bond. For example, she is not able to initiate playful interaction with [T.B.S.] [T.B.S.] on occasion moved away from Mother when Mother attempted to create physical contact. [T.B.S.] demonstrated no preference for proximity to Mother. [T.B.S.] did not look to Mother for shared positive affect[ion], did not engage in activity to seek Mother's attention or to bring Mother into proximity. Mother continues to present with significant parenting deficits.

*Id.* at ¶ 12.

By orders dated May 20, 2014, the orphans' court terminated Mother's parental rights pursuant to 23 Pa.C.S.A.§§ 2511(a)(2), (5), (8), and (b). On June 18, 2014, Mother timely filed notices of appeal and concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i), which this Court consolidated *sua sponte*.[3] ***See generally*** Pa.R.A.P. 513.

On appeal, Mother presents the following issues for our review.

I. Whether the [orphans'] court erred in finding by clear and convincing evidence that the moving party met its burden as to terminating the parental rights of [M]other under 23 Pa.C.S. § 2511(a)(2)?

II. Whether the [orphans'] court erred in finding by clear and convincing evidence that the moving party met its burden as to terminating the parental rights of [M]other under 23 Pa.C.S. § 2511(a)(5)?

III. Whether the [orphans'] court erred in finding by clear and convincing evidence that the moving party

---

[3] In lieu of filing Rule 1925(a) opinions, the orphans' court adopted its May 20, 2014 findings of fact for T.J.S. and T.B.S. We further note that the orphans' court states it adopts its May 15, 2014 findings of fact, but said orders were not filed until May 20, 2014.

met its burden as to terminating the parental rights of [M]other under 23 Pa.C.S. § 2511(a)(8)?

Mother's Brief at 4.

We review a termination order according to the following standard.

> [A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. *In re R.J.T.*, 9 A.3d 1179, 1190 ([Pa.] 2010). If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. *Id.*; [*In re*] *R.I.S.*, 36 A.3d [567,] 572 [(Pa. 2011) (plurality)]. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. *Id.*; *see also Samuel-Bassett v. Kia Motors America, Inc.*, 34 A.3d 1, 51 ([Pa.] 2011); *Christianson v. Ely*, 838 A.2d 630, 634 ([Pa.] 2003). Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. *Id.*
>
> As we discussed in *R.J.T.*, there are clear reasons for applying an abuse of discretion standard of review in these cases. We observed that, unlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. *R.J.T.*, [*supra*]. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment;

instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion. *In re Adoption of Atencio*, 650 A.2d 1064, 1066 ([Pa.] 1994).

*In re Adoption of S.P.*, 47 A.3d 817, 826–827 (Pa. 2012) (parallel citations omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, which requires a bifurcated analysis.

Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007), *citing* 23 Pa.C.S.A. § 2511. The burden is on the petitioner to prove by clear and convincing evidence that the asserted statutory grounds for seeking the termination of parental rights are valid. *In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009).

- 8 -

Instantly, we conclude the orphans' court properly terminated Mother's parental rights pursuant to Section 2511(a)(2) and (b), which provides as follows.

**§ 2511. Grounds for involuntary termination**

**(a) General Rule**.--The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

…

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

…

**(b) Other considerations**.--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2), (b); *see also In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*) (stating that this Court need only agree with

any one subsection of Section 2511(a), in addition to Section 2511(b), in order to affirm the termination of parental rights).

To satisfy the requirements of Section 2511(a)(2), the moving party must produce clear and convincing evidence regarding the following elements: "(1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied." *In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003). "The grounds for termination of parental rights [under Section 2511(a)(2),] due to parental incapacity that cannot be remedied, are not limited to affirmative misconduct … [t]o the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." *In re A.L.D.*, 797 A.2d 326, 337 (Pa. Super. 2002).

With respect to Section 2511(b), this Court has explained the requisite analysis as follows.

> Subsection 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. In *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa. Super. 2005), this Court stated, "Intangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." In addition, we instructed that the trial court must also discern the nature and status of the parent-child bond, with utmost

- 10 -

> attention to the effect on the child of permanently severing that bond. ***Id.*** However, in cases where there is no evidence of a bond between a parent and child, it is reasonable to infer that no bond exists. ***In re K.Z.S.***, 946 A.2d 753, 762-63 (Pa. Super. 2008). Accordingly, the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case. ***Id.*** at 63.

***In re Adoption of J.M.***, 991 A.2d 321, 324 (Pa. Super. 2010).

On appeal, Mother argues that the evidence does not support termination under Section 2511(a)(2) because there is a "reasonable possibility that the causes and conditions which have led to separation, namely parenting issues, can be remedied and the family restored." Mother's Brief at 10. Specifically, Mother asserts that she has had stable housing for the last year, and with the assistance of her husband,[4] she "would be able to remedy the parenting issues in this case." ***Id.*** Further, Mother relies on the testimony of the Court Appointed Special Advocate, Rhonda Dean, who stated that she observed one supervised visit of Mother with T.J.S. and T.B.S. during which Mother "multi-tasked well" in caring and interacting with each child. N.T., 5/15/14, at 142. Upon careful review, we reject Mother's arguments.

The testimonial evidence reveals that WCCB first became involved with this family in 2010, when Mother self-referred due to her frustration in parenting T.J.S., who was then approximately three years old. N.T.,

---

[4] Mother testified that she married R.B. on May 31, 2013. N.T., 5/15/14, at 146. R.B. is not the biological father of T.J.S. or T.B.S.

5/15/14, at 7. Lisa Wood, a clinical social worker at Wesley Spectrum Services, testified that she began working with Mother in September 2010 with respect to her parenting skills, budgeting issues, and housing concerns. *Id.* Wood testified regarding Mother's parenting deficits as follows.

> Q. What were the deficits in parenting that you were working on with [M]other?
>
> A. [ ] There were issues in terms of what [T.J.S.] was eating, how much he was eating, when he was eating, how much he was sleeping, the diaper changes. And with mom there were a lot of incidents where, when we would talk about things, she would blame dad or she would say dad needs to do that….

*Id.* at 14. In addition, Wood testified, "there was concern during that time in general in regards to [Mother's and Father's] decision making and judgment." *Id.* at 14-15.

On March 15, 2011, T.J.S. was placed in custody due, in part, to housing instability, domestic violence between Mother and Father, and an allegation that the child had a physical injury caused by Father that was subsequently deemed unfounded. *Id.* at 15-17, 127. T.J.S. was returned home to Mother on May 16, 2011, with services ordered. *Id.* at 18, 127-128. In addition, a safety plan was developed precluding Mother from being alone with T.J.S. for more than two hours at a time. *Id.* at 18.

Wood continued to work with the family through the time of T.B.S.'s birth in November 2011, during which concerns remained involving housing instability and parenting deficits that risked the safety and welfare of T.J.S.

*Id.* at 18-26. On December 5, 2011, less than one month after T.B.S.'s birth, T.J.S. and T.B.S. were placed in custody after Mother called WCCB to report that Father had left the home. *Id.* at 26. Wood visited the home on the day of placement and found T.B.S. bright red, lethargic, and with his eyes rolling backwards. *Id.* at 26-27. Further, Wood found that T.B.S. was dressed too warmly, and that Mother "had not noticed how hot [T.B.S.] was or what his needs were during that time." *Id.* at 27.

After the placement, Wood supervised Mother's visits, which increased from twice to three times per week.[5] *Id.* at 31-32. Wood testified that Mother consistently failed to display age-appropriate parenting skills during the visits, including, but not limited to, showing a minimal reaction to T.B.S. falling and hitting his head, and T.J.S. having a plastic bag over his head. *Id.* at 32-35, 40-44. Further, Wood testified that Mother was unable to focus on T.J.S. and T.B.S. at the same time during visits. *Id.* at 38. In January 2013, Mother's husband, R.B., began attending supervised visits with her. *Id.* at 44. Wood testified that Mother "wanted him to be like the main caretaker for T.B.S[.]"[6] *Id.*

---

[5] Wood testified that, following the voluntary termination orders in July of 2013, supervised visits decreased, with the last one occurring on September 12, 2013. N.T., 5/15/14, at 49, 51. However, upon the reversal of the voluntary termination orders and the remand of the case by this Court, Mother participated in an additional five visits with T.J.S. and T.B.S. *Id.* at 51.

[6] Wood testified that R.B. appeared uncomfortable and somewhat afraid around T.J.S and T.B.S. during visits. N.T., 5/15/14, at 54-55.

Wood testified that Mother does not understand age-appropriate behaviors and the proper development of T.J.S. and T.B.S. *Id.* at 46-49. Indeed, Carol Hughes, M.A., a licensed psychologist, observed three visits between Mother and T.J.S. and T.B.S. and testified that Mother "struggle[d] to utilize the direction and the instruction provided by the supervisor in these visits. [T]here was lack of monitoring for safety. You see instances of the inappropriate developmental expectations. There's lack of empathetic responding [by Mother to T.J.S. and T.B.S.]" *Id.* at 89.

Wood stated that Mother has made no progress in her parenting skills. *Id.* at 49-51, 57. Wood testified on cross-examination by the Guardian Ad Litem (GAL) as follows.

> Q. So, if you're looking at the big picture and [Mother's] capacity to take care of these kids?
>
> A. Yes. It's been the ongoing theme of not being able to retain information … and an ongoing theme of repeatedly talking about the same things over and over and over. And then just happening, like you said, one time it's the diaper, one time it's a medication bottle, one time it's a fishing hook, one time it's a glass; just repeated things of the same theme or nature of safety or of caretaking or feeding. You know, there are themes in all of those areas that speak back to not being able to meet the basic needs of the [C]hildren.

*Id.* at 63-64. Likewise, the WCCB caseworker, Susan Storer, testified that Mother has not made any progress in her parenting skills. *Id.* at 132-133.

Significantly, Mother testified that, in addition to services from Wood, she currently receives services from Life Way Support Center, which teaches

hands-on parenting.  *Id.* at 148, 151.  However, Mother testified with respect to the difficulty she encounters during supervised visits as follows.

> Q. What do you do during visits?
>
> A. I … interact with the [C]hildren.  I play with them and try to keep [T.B.S.] occupied, but it's kind of hard to keep a two year old occupied because … he's like the Energizer Bunny, he doesn't want to sit still. It's hard to play with the six year old while watching after my two year old.

*Id.* at 150-151.

The foregoing testimonial evidence demonstrates that Mother's repeated and continued incapacity has caused T.J.S. and T.B.S. to be without essential parental care, control or subsistence necessary for their physical or mental well-being, and that the causes of her incapacity will not be remedied.  As such, we discern no abuse of discretion by the orphans' court in terminating Mother's parental rights pursuant to Section 2511(a)(2).[7]

Further, contrary to Mother's assertion, we will not disturb the termination orders based on the testimony of the Court Appointed Special Advocate, Rhonda Dean.  Dean wrote two reports in the underlying matter, dated January 28, 2013, and March 27, 2014, which the orphans' court admitted into evidence during the termination hearing.  Dean testified that she observed three visits between Mother and T.J.S. and T.B.S.  N.T.,

---

[7] Based on this disposition, we need not address Mother's issues with respect to Sections 2511(a)(5) and (8).

5/15/14, at 141. In the January 28, 2013 report, Dean stated that, during the supervised visit on December 27, 2012, Mother "multi-tasked well with caring for and interacting with both of her children." *Id.* at 141-142, Exhibit A at 4. Nevertheless, Dean testified that T.J.S. and T.B.S. share a bond with the foster parents, and she did not recommend removing them from the foster home. *Id.* at 143-145. In fact, upon inquiry by the orphans' court, Dean testified that she has the same recommendation as the agency, that is, to terminate Mother's parental rights. *Id.* at 145. Therefore, we conclude the orphans' court did not err in concluding there was clear and convincing evidence to support the termination of Mother's parental rights pursuant to Section 2511(a)(2).

Although Mother does not invoke Section 2511(b) in her issues on appeal, in light of the requisite bifurcated analysis, we review the developmental, physical, and emotional needs and welfare of the child. With respect to the bond analysis pursuant to Section 2511(b), our Supreme Court confirmed that, "the mere existence of a bond or attachment of a child to a parent will not necessarily result in the denial of a termination petition." *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013). The Court further stated that, "[c]ommon sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." *Id.* at 268 (citation omitted). Moreover, the Court directed that, in weighing the bond considerations

pursuant to section 2511(b), "courts must keep the ticking clock of childhood ever in mind." The Court observed that, "[c]hildren are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts fail … the result, all too often, is catastrophically maladjusted children." *Id.* at 269.

In this case, Hughes observed three visits between Mother and T.J.S. and T.B.S. and performed two bonding evaluations. N.T., 5/15/14, at 102-103. Hughes testified she observed T.J.S. engage in solitary play during the visits, and she opined that T.J.S. displayed a relational pattern of avoidance toward Mother. *Id.* at 71, 72, 79, 104. Hughes testified neither child showed significant joy in seeing Mother during the visits. *Id.* at 114. With respect to T.B.S., Hughes testified that, because Mother was his primary caregiver for less than one month, he does not have an attachment to her. *Id.* at 104.

In contrast, Hughes testified that T.J.S. and T.B.S. have a bond with their foster parents, a pre-adoptive resource, with whom they have lived for 17 months. *Id.* at 89, 110, 134. Significantly, Hughes testified T.J.S. and T.B.S. would suffer a "great negative impact" if they are removed from their foster family. *Id.* at 100. With respect to terminating Mother's parental rights, Hughes agreed on direct examination that no harm would come to either child and testified, "I don't believe the children would have adjustment problems if Mother's rights were terminated." *Id.* at 101.

Based on the foregoing testimonial and documentary evidence, we discern no abuse of discretion by the court in concluding that T.J.S. and T.B.S.'s "primary emotional attachment is with the foster parents," and returning T.J.S. and T.B.S. to Mother would have a "significant negative effect on the[ir] development[.]" Findings of Fact, 5/20/14, at 4. Accordingly, we affirm the orders involuntarily terminating Mother's parental rights pursuant to Section 2511(a)(2) and (b).

Orders affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/2/2015